UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARECIA S. BELL,

    Plaintiff,

v.                              Case No. 8:20-cv-1274-VMC-CPT

DENIS McDONOUGH, Secretary,
DEPARTMENT OF VETERANS AFFAIRS,

    Defendant.
_____/

**ORDER**

This matter comes before the Court upon consideration of Defendant's Motion for Summary Judgment (Doc. # 46), filed on November 3, 2021. Plaintiff Marecia Bell responded on December 8, 2021 (Doc. # 52), and Defendant replied on December 21, 2021. (Doc. # 56). For the reasons that follow, the Motion is granted in part and denied in part.

**I.    Background**

    **A.    Bell is hired by the SCI Unit**

In October 2016, Bell was hired as an Assistant Nurse Manager ("ANM") with the Spinal Cord Injury ("SCI") unit at the James A. Haley VA Medical Center (the "Tampa VA" or "the VA"). (Doc. # 46 at 2, ¶ 1; Doc. # 52 at 14, ¶ 1). Specifically, Bell occupied the role of Assistant Nurse Manager, staffing coordinator. (Doc. # 46-2 at 552 (8:5-8)).

1

Bell's direct supervisor was Julia Lewis, the Assistant Chief Nurse for the SCI unit. (Id. at 156 (3:20-25)). One rung above Lewis was the position of Chief Nurse of the SCI unit. When Bell began with SCI, Kathy Michel was the interim Chief Nurse and Mary Alice Rippman became the Chief Nurse in January 2017. (Id. at 269 (5:15-21), 554 (15:3-9)).

Lewis explained that the Assistant Nurse Manager, staffing coordinator position "was intended to be the person who helped the chief nurse manage the human resources [of the department]. So that could include handling the movement of staff at different shift hours when there are call outs. In nursing we are required to provide safe numbers, so that person would help manage resources, meaning nurses, NAs, LPNs, and RNs to get the appropriate skill mix on the right unit at the right time to keep that safe mix." (Id. at 553 (9:18-25)). Typically, an ANM like Bell would have reported to a Nurse Manager. (Id. at 192 (12:19-20)). But, as Laureen Doloresco – the Chief Nurse Executive at the Tampa VA – explained, the situation in the SCI unit was "unique" because Bell was reporting directly to the Assistant Chief Nurse. (Id. at 191 (5:12-16), 192 (12:14-18), 307).

Within a month of starting the ANM position, Bell was asked to be the direct supervisor of the Resource Pool. (Doc.

# 46-2 at 5 (14:23-15:2)). As explained by Lewis, the Resource Pool was a group of staff members who would "float" to the various units and clinics in the SCI, Polytrauma, and Rehab units. (Id. at 165 (41:13-22); see also Id. at 192 (11:5-10) (Doloresco explaining that the SCI Resource Pool was a "float pool" of nurses internal to the SCI who would go to different units to provide patient care)). Bell's job was to assign these workers to various units. (Id. at 158 (11:13-16)). The Resource Pool had 9 to 15 employees during the relevant time frame. (Id. at 157 (9:19-21)).

The Resource Pool announcement came as a "shock" to Bell because "that's not what [she] was hired to do" and she had been told that she would not be supervising people in the ANM position. (Id. at 5 (16:12-25)). Bell testified that the two previous employees to supervise the Resource Pool were both Assistant Chief Nurses. (Id. at 6 (17:9-16)). Additionally, "there were no other Assistant Nurse Managers in the Tampa VA that were directly supervising[,] first line supervisor of any staff." (Id. at 6 (18:15-18)). According to Bell, "other nurses that were the . . . first line supervisor over staff were at minimum Nurse Managers and then Assistant Chief and Chief. . . . That was the policy." (Id. at 6 (19:18-21)). Lewis confirmed that the three other people who have been

responsible for the Resource Pool were all nurse managers. (Id. at 156 (4:14-5:7)). Lewis additionally confirmed that no other ANM had managed the Resource Pool prior to Bell and that decision "came out of [Lewis] being overwhelmed after [multiple] management people left." (Id. at 173 (72:5-19)).

According to Bell, shortly after that announcement was made, she asked her supervisors, Lewis and Michel, "were they going to change [her] position to a nurse manager's position and give [her] the pay for directly supervising staff." (Id. at 5-6 (15:11-13, 17:1-4)). Bell testified that Lewis and Michel told her that this promotion and/or pay raise would happen, they just had to get Doloresco to "sign off" and "process the paperwork." (Id. at 6 (17:5-8, 19:24-20:6)); see also (Doc. # 52-4 at 1-2 (Bell's written declaration stating that in November 2016 Lewis and Michel told her that her position would be changed to that of a nurse manager and she would be paid on the nurse manager pay scale)). However, Lewis testified that it was not "within [her] power to make that happen" because the VA's "hiring system requires that it be a competitive position." (Id. at 168 (51:18-52:7)). And Doloresco testified that she never had discussions with anyone about making Bell a nurse manager or converting her position to a nurse manager position. (Id. at 201 (47-49)).

4

Overseeing the Resource Pool was not the only supervisory duty that Bell fulfilled while an ANM with the SCI unit. According to Lewis, Bell had the ability to certify employees' time and attendance records, a duty normally reserved for "supervisors" or nurse managers. (Id. at 163 (31:15-20, 33:14-25)). Bell testified that, in her very first month on the job, she assisted Lewis with multiple administrative tasks normally undertaken by the Assistant Chief Nurse. (Id. at 17 (63:1-4) (Bell testifying that Lewis "needed me to help her with leadership duties and to manage SCI Polytrauma and Rehab")); see also (Id. at 115 (Lewis commenting in an email that she had previously been "overwhelmed" at work and needed Bell to help manage the SCI)).

**B.** **Bell begins experiencing issues in the SCI unit**

Bell stated that, beginning in December 2016, she was subjected to "hostility and unfair and vulgar behavior" by a co-worker, Wanda Soto-Hunter. (Doc. # 46-2 at 7 (24:1-4)). Soto-Hunter would yell "unpleasant comments" to Bell at staff meetings, stating for example that the meetings were only for nurse managers. (Id. at 7 (24:6-25:3)). In February 2017, Bell sent Lewis, Michel, and Rippman an email complaining about Soto-Hunter's "disrespectful [and] demeaning behavior"

towards her. (Doc. # 46-2 at 95). Bell stated she was "not requesting intervention at this time." (Id.). In April 2017, Bell sent another email about Soto-Hunter's behavior to Lewis and Rippman, stating that Soto-Hunter "continues to be disrespectful, demeaning and unprofessional to me in a bullying and hostile manner." (Id. at 103). According to the email, Soto-Hunter had yelled at Bell, undermined her work staffing nurses, and continued to ridicule her for not being part of the management team. (Id.). Bell also noted in this email that she was planning to file a complaint with the Equal Employment Opportunity Commission ("EEOC"). (Id.).

Bell testified that Soto-Hunter's behavior was racially motivated because she was the only African-American employee in SCI management at that time and Soto-Hunter did not treat the other employees badly. (Id. at 9 (32:16-25)). Based on Soto-Hunter's behavior, Bell filed her first complaint with the EEOC in April 2017. (Id. at 13 (46:10-12), 264).

In June or July of 2017, Bell was reassigned to work night shifts several times a week, from 3:30 pm to midnight. (Id. at 15 (53:1-54:17); 160 (22:1-23:14)). As Lewis explained, Bell "worked the evening shift for a period of time over several months, and she was representative of the management team in that role in the evenings." (Id. at 160

6

(20:24-21:2)). Rippman conceded that Bell was the only ANM who worked the late shift every day. (Id. at 372 (34:20-25)). Bell claims that moving her to the night shift was done in retaliation for the filing of her first EEOC complaint and was also racial discrimination. (Id. at 15 (54:8-55:2)).

Bell's problems with Soto-Hunter continued. In June 2017, Bell emailed management about how Soto-Hunter "continues to demean me in my job as assistant nurse manager and as a staffing coordinator and is very disruptive to my staffing coordinator work duties and bullies me to assign SCI Resource staff to the SCI units she manages." (Doc. # 46-2 at 258). Bell documented a June 2017 meeting in which Soto-Hunter raised her voice at Bell over certain staffing decisions Bell made. (Id.). In an August 2017 email, Bell documented an incident where Soto-Hunter undermined certain staffing decisions made by Bell, which decision Rippman upheld. (Id. at 119).[1]

Bell testified that, in her opinion, she was not initially allowed to sign the "proficiencies" (employee work evaluations) for SCI Resource Pool employees due to her race,

---

[1] Soto-Hunter was eventually "removed from her position, detailed out," and moved to a nurse manager position elsewhere in the VA. (Doc. # 46-2 at 276 (35:1-9)).

stating that, "I was the only one African American Black in management in Spinal Cord at that time. . . . I had already filed an EEO Complaint. And I felt like this was further racial discrimination. And also with me just looking around the VA to see how many African American Blacks were in management at the James A. Haley hospital, which were not very many at all, very minimal." (Doc. # 46-2 at 29 (110:21-111:13). Lewis testified that ANMs at first were not allowed to sign evaluations, but eventually HR changed their position on that. (Id. at 157 (9:1-14)).

Bell also claims that her superiors pressured her to mistreat VA staff based on race. For example, when assigning "light duty" tasks, Bell's supervisors directed her to tell a black woman to scrape gum and food from underneath the bedside tables, while asking a white woman to answer phones. (Id. at 15 (55:14-56:20)).

As Defendant admits, Bell was a successful employee during her time with SCI. (Doc. # 46 at 1-2). She was rated as "outstanding" in her employee performance review for the time period between October 2016 and September 2017. (Doc. # 46-2 at 475). The performance review noted that Bell joined SCI as the ANM / Staffing Coordinator "amid sweeping leadership changes." (Id. at 474). And:

> [W]ith almost no assistance, she shouldered full responsibility for the SCI Resource Pool to include hiring, coaching / mentoring, educating and even disciplining staff when needed.  Further, when needed, she transitioned to work evening shifts routinely to provide a stabilizing leadership presence in-house during that work time.  Due to her efforts, many staff members have commented that the work environment on that shift has greatly improved.

(Id.).

Beginning in February or March 2018, Bell was going to be transferred to the SCI-D unit and placed under the supervision of Nurse Manager Lynette Carballo. (Id. at 164 (37:13-16); 281 (53:18-25); see also Id. at 518, 520). Bell would have retained her role leading the SCI Resource Pool, with Carballo acting as the "second line supervisor." (Id. at 518). Lewis testified that this move was contemplated as a "win/win" because Carballo had "one of the lower numbers of report to employees" and it would enable Bell to work as an ANM in an inpatient setting. (Id. at 164 (38:5-16)). Bell, however, viewed the transfer as racial discrimination and retaliation. (Id. at 30-31 (116-19)). Bell initiated contact with the EEOC in late February 2018 on an informal EEO claim, which claim became formal in March 2018. (Doc. # 52-3 at 12).

In March 2018, Bell met with Doloresco and asked to be removed from the SCI unit, stating that she was being

"retaliated against for filing an EEO complaint and not following" Rippman's direction with respect to a certain employee investigation. (Id. at 524). According to a March 6, 2018, email, after that meeting, Lewis told Bell that her position had been eliminated. (Id.). Bell told Doloresco she was receiving disparate treatment, was being "bullied by [Lewis] and [Rippman]," and was being forced to work in a hostile work environment. (Id.). Doloresco replied that same day saying, among other things, that Bell's position had not been eliminated – she was being "aligned" under a nursing manager (Carballo). (Id. at 523).

### C.   **Bell moves to the HBPC program**

Instead of moving to the SCI-D unit, however, in late March of 2018, Bell accepted a position with the VA's Home Based Primary Care ("HBPC") program. (Doc. # 46-2 at 34 (131:1-3), 640-43). Bell's direct supervisor at HBPC was Nurse Manager Tammie Terrell. (Id. at 804-08). At that time, Terrell's direct supervisor was Raina Rochon, Chief Nurse over multiple departments, including the HBPC program. (Id. at 807-08). Rochon, as a Chief Nurse, reported to Doloresco.

Dr. June Leland is the medical director of the Tampa VA's HBPC program. (Id. at 603 (5:10-12)). Dr. Leland wrote an email on March 30, 2018, that HBPC was "expanding" its use

10

of RNs. (Id. at 600). According to the email, the group had selected five new RNs. (Id.). When one of the selected nurses declined the position, the position was offered to Bell as the "next in line" based on the hiring committee's scoring. (Id.).

Specifically, in a March 30, 2018, email chain, Terrell asked Dr. Leland where Bell should be placed. (Id. at 641-42). Dr. Leland responded, "There must be a mistake. We did not select her." (Id. at 641). Terrell wrote back that "based on your scoring from the interviews [Bell] is next in line[.]" (Id. at 640). Dr. Leland requested that Bell be placed elsewhere until the entire hiring committee could reconvene to fill the spot. (Id. at 639). Dr. Leland also wrote to HR, "heartily object[ing] to [hiring] a candidate" that was not chosen by the entire committee. (Id. at 600). Eventually, HR stated that Bell's selection was valid, and her placement at HBPC went through. (Id. at 612 (41:7-16), 658-64).

According to Dr. Leland, she did not have anything against Bell, but was objecting to the selection process. (Id. at 612 (41:24-42:3)). But Bell believes that Dr. Leland tried to block her from the position due to her race stating that, after she began working in the HBPC program, Dr. Leland committed "multiple" acts of racial discrimination against

Bell and other African-American employees. (Id. at 39 (150:9-21)).

According to Bell, the discriminatory conduct continued after she moved to HBPC. For example, all the other HBPC nurses were assigned patients close to where they lived, except for Bell. (Id. at 40 (155:4-9)). Nurse Manager Terrell verified that "we were trying to pair up everybody . . . based on where they resided." (Id. as 834 (25:2-5)).

Bell explained that she was assigned patients in both the Polk County, Lakeland-area and in south Hillsborough County, neither of which was close to where she lived. (Id. at 619 (69:9-11), 822). As noted by Dr. Leland in a June 2018 email: "Our new RN Marecia Bell has been given a panel of 26 patients across 4 providers ranging from South Hillsborough to Lakeland. Her drive times between all four providers are huge, and we are going to restrict her to 2 providers by next week." (Id. at 902).

Bell was eventually reassigned to just cover south Hillsborough County. (Id. at 655). Bell believed that moving her to the south Hillsborough County rotation was done in retaliation for her EEO complaint, although Terrell assured her it was only due to patient demands. (Id. at 872).

Terrell explained that Bell and others felt that the work was not being distributed fairly and that rules or policies were not being applied fairly by Dr. Leland. (Id. at 836 (34-35)). Terrell stated that, in her opinion, Dr. Leland gave differential and less preferential treatment to African-American staff members. (Id. at 834 (27:5-13), 836 (35:4-9)). As Terrell described it, Dr. Leland was "very strict" and inflexible on certain policies but "she didn't hold the same standards" across her entire staff and there was obvious favoritism. (Id. at 837 (38:3-15)).

### D.   **Bell's request for a part-time position and LWOP**

In January 2019, Bell requested a part-time position, effective that August or September. (Doc. # 46-2 at 45 (176:15-25), 781). Nurse Manager Terrell forwarded Bell's request to Chief Nurse Rochon. (Id. at 780). From the email traffic, it appears that Bell was trying to procure a part-time position in a different department. (Id. at 780).

Rochon testified that whether Bell would receive this part-time position in another department was out of her hands — employees could apply for new positions within the VA, and she would be notified by HR if the employee was going to be reassigned. (Id. at 734 (68:4-12)). But, as Bell tells it, Rochon had to approve her move to a part-time position, and

13

Rochon would not do it because of Bell's race and prior EEOC activity. (Id. at 46 (177:17-178:16), 48 (186:11-15)).

In June 2019, having been unable to find a part-time position, Bell requested leave without pay from August 2019 until August 2020 (the "LWOP request") in order to care for herself and her husband following surgeries they had. (Id. at 782). Rochon sent a memo to her supervisors regarding Bell's LWOP request, recommending that it be denied and essentially stating that the team did not have the capacity to cover an absent employee for a year. (Id. at 791-94). Andrew Sutton, the head of HR, Doloresco, and the VA's director, Joe Battle, also disapproved the request. (Id.). According to Bell, her LWOP request was denied on the basis of her race and prior EEOC activity. (Id. at 52 (203:1-9)). She explained that she was the only Black person working as an RN in the HBPC program at that time. (Id. at 203:16-20)). She said Battle told her he would approve the LWOP if she would drop all of her EEOC complaints. (Id. at 203-04). Bell refused to do so and, instead, filed a new EEOC complaint in August 2019 based on the denial of her LWOP request. (Doc. # 52-3 at 9-11).

Bell did eventually take leave under the Family Medical Leave Act ("FMLA") starting in June 2019. (Doc. # 46-2 at 926, 933-34). After her approved leave time under the FMLA

was exhausted, Bell did not return to work and was marked as AWOL until she returned in June 2020. (Id. at 53 (205:14-18)).

Bell initiated this action against the Department of Veterans Affairs on June 3, 2020, asserting claims for racial discrimination under Title VII (Count One); retaliation under Title VII (Count Two); and a hostile work environment under Title VII (Count Three). (Doc. # 1). Bell also brought a claim under the FMLA, but that claim was later dismissed. (Doc. # 45). She seeks damages, attorneys' fees and costs, and injunctive relief. (Doc. # 1 at 20-25). The VA filed an answer, and the case proceeded through discovery. The VA now moves for summary judgment on all claims. (Doc. # 46). The Motion has been fully briefed (Doc. ## 52, 56), and is now ripe for review.

## II.  Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude

a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to

16

be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Analysis**

Bell worked as a federal government employee and thus this case is controlled by Title VII's federal-sector provision. It states in relevant part that "[a]ll personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). The Eleventh Circuit recently held that the Supreme Court's decision in Babb v. Wilkie, 140 S. Ct. 1168 (2020) ("Babb I") – which interpreted the nearly identical federal-sector provision of the Age Discrimination in Employment Act

("ADEA") – is applicable to Title VII federal sector cases. Babb v. Sec'y, Dep't of Veterans Affairs, 992 F.3d 1193 (11th Cir. 2021) ("Babb II").

As the Supreme Court explained in Babb I, the language "shall be made free from any discrimination" means that personnel actions must be "untainted by any consideration" of the protected factor. 140 S. Ct. at 1171. "If . . . discrimination plays any part in the way a decision is made, then the decision is not made in a way that is untainted by any such discrimination." Id. at 1174. "As a result, [the protected factor] must be a but-for cause of discrimination – that is, of differential treatment – but not necessarily a but-for cause of the personnel action itself." Id. at 1173. In other words, to state a claim under Title VII, the protected factor "must be the but-for cause of *differential treatment*, not that the [protected factor] must be a but-for cause of *the ultimate decision*." Id. at 1174.

But showing that a protected factor was the but-for cause of the challenged employment decision still plays an important role in determining the appropriate remedy. Id. at 1177. Showing that discrimination was the but-for cause of the ultimate employment decision or outcome will unlock all available forms of relief such as reinstatement, back pay,

and compensatory damages. Id. at 1171, 1177-78. But if a plaintiff makes only the lesser showing, that is, if a plaintiff shows that discrimination was a but-for cause of differential treatment but not the but-for cause of the employment decision itself, that plaintiff can still seek injunctive or other forward-looking relief. Id. at 1178.

In applying Babb I to a Title VII federal-sector case, the Eleventh Circuit wrote that:

> So, even when there are non-pretextual reasons for an adverse employment decision . . . the presence of those reasons doesn't cancel out the presence, and the taint, of discriminatory considerations. Without quite saying as much, then, it seems that the Supreme Court accepted Babb's argument that the District Court should not have used the McDonnell Douglas framework.

Babb II, 992 F.3d at 1204 (citation and internal quotation marks omitted).

Thus, under the Babb framework, Bell needs to show only that her race/color played a part in the way an employment decision was made, that is, that the decision was "tainted" by discrimination. Babb, 140 S. Ct. at 1174; see also Durr v. Sec'y, Dep't of Veterans Affairs, 843 F. App'x 246, 247 (11th Cir. 2021) (explaining that, after Babb, "a plaintiff's claim survives if 'discrimination played any part in the way a decision was made'" (internal alterations omitted)).

19

A.  **Racial Discrimination Claim**

To be actionable, discrimination must influence a "personnel action." See 42 U.S.C. § 2000e-16(a) ("All personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination on race, color, religion, sex, or national origin."). Personnel actions in the federal employment context "include most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews." Babb I, 140 S. Ct. at 1172-73 (citing 5 U.S.C. § 2302(a)(2)(A)).

Here, with respect to her duration of employment in the SCI unit (October 2016 to March 2018), Bell claims that discrimination played a part in the following employment decisions: (1) "On February 20, 2018, [Bell's] position description was changed; (2) On March 5, 2018, [Bell] was denied a reassignment; (3) On March 5, 2018, [Bell's] position was eliminated; and (4) [Bell] was denied appropriate supervisory pay." (Doc. # 1 at ¶ 13). She also argues that the overall hostile work environment at the Tampa VA was a "personnel action" because it constituted a "significant change in . . . working conditions." (Doc. # 52 at 22); see also Babb II, 992 F.3d at 1209 ("The text of the federal-sector provision addresses 'personnel actions,' and so it

20

seems clear enough that an actionable retaliatory-hostile-work-environment claim must describe conduct that rises to that level.").

The Court first examines Bell's claim with respect to her employment with the SCI unit. With respect to the alleged personnel actions taken during this time, Bell has little beyond her own subjective beliefs to demonstrate that racial discrimination played a part in any of these decisions. A plaintiff's speculative assertions of racial discrimination are not enough to overcome summary judgment. See Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."); Jeffery, 64 F.3d at 593-94 (explaining that the party opposing summary judgment must come forward with evidence setting forth specific facts to show that there is a genuine issue for trial).

Bell points to the fact that she was the only African-American supervisor in the SCI unit, but she does not point to any non-African-American ANMs who were given supervisory or management duties and then persuaded the VA to give them

a promotion and/or pay raise.[2] There is similarly no evidence of any ANM at the VA who was given supervisory powers and then, with or without a promotion, given pay commensurate with that of a nurse manager. Nor has Bell pointed to any other employees who were allowed, upon request, to transfer to another unit because they were unhappy in their current position.

Although it is true that Babb lessened the burden that federal-sector plaintiffs need to show, Bell has not met this lesser burden because she has not pointed to any evidence that racial discrimination was the but-for cause of any differential treatment she experienced. For example, the Eleventh Circuit has recently upheld a district court's grant of summary judgment in favor of the defendant-employer where the plaintiff offered no direct evidence that race played a role in the defendant's promotion decisions and his contention that he was more qualified than the people who got promoted was not supported by the record. Malone v. U.S. Att'y Gen., 858 F. App'x 296, 301 (11th Cir. 2021) (writing that,

---

[2] The record reflects that Shernise Henshall was promoted from an ANM to an acting nurse manager position and then Henshall got the permanent nurse manager position with commensurate pay. (Doc. # 46-2 at 723-34 (24:23-26:14)). But Henshall is also African-American. (Doc. # 52 at 7).

even under the Babb standard, summary judgment was proper on racial discrimination claim where plaintiff could not "point to any record evidence that his application for DHO was treated differently because he is white"); see also Buckley v. McCarthy, No. 4:19-CV-49 (CDL), 2021 WL 2403447, at *1 & *6 (M.D. Ga. June 11, 2021) (granting defendant's summary judgment motion under Babb standard where plaintiff was the only Black provider at the subject clinic and contended that she was assigned fewer patients and that her coworkers called her an "angry Black woman" because the evidence did not demonstrate that race played any role in the decision to remove that plaintiff from federal service).

It is evident that Bell thinks it unfair that she was expected to perform supervisory duties while retaining the position and pay grade of an ANM. But this Court is not in the position to be the arbiter of whether certain employment decisions were fair, it is concerned solely with whether those decisions were based on illegal reasons. See Gogel v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1148 (11th Cir. 2020) ("The role of this Court is to prevent unlawful Title VII practices, not to act as a super personnel department that second-guesses employers' business judgments. Our sole

concern is whether unlawful discriminatory or retaliatory animus motivates a challenged employment decision.").

The Court now turns to Bell's time with the HBPC program. During that timeframe, from April 2018 until March 2019, "Dr. Leland assigned [Bell] an unfair workload requiring her to conduct patient visits between two counties, the farthest travel distance" and on July 31, 2019, her LWOP request for August 2019 through August 2020 was denied.[3] (Doc. # 1 at ¶ 38). In her testimony, Bell identifies the only other African-American nurse in the program, Dietrich Langston. (Doc. # 46-2 at 43 (167:1-4)). According to the testimony, Dr. Leland assigned Bell and Langston to work areas far from their homes and also unfairly blocked Bell and Langston from taking advantage of certain parking privileges. (Id. at 167:4-25). Bell testified that Dr. Leland did not treat other nurses in the program this way. (Id. at 40 (155:4-9)). And Bell has also presented the testimony of Nurse Manager Terrell that, in her opinion, Dr. Leland gave differential and less preferential treatment to African-American staff members. (Id. at 834 (27:5-13), 836 (35:4-9)). Given corroborated

---

[3] None of the other actions that Bell complains of during this time frame, such as "inappropriate comments" being made, rises to the level of a personnel action or employment decision by the VA.

differential treatment by Dr. Leland, a reasonable jury could also infer that race played a part in Dr. Leland's efforts to block Bell from joining the HBPC program as a nurse. Thus, a reasonable jury could infer that race was a but-for cause of the different treatment that Bell experienced with respect to the HBPC application process and the work assignments she received once she was part of the HBPC program.

Finally, Bell has not produced any evidence beyond her own speculation that race played a part in the VA's decision to deny her LWOP request.

Accordingly, the VA's motion for summary judgment is granted in part and denied in part with respect to Count One. The Motion is granted to the extent it seeks summary judgment with respect to Bell's claim of racial discrimination pertaining to personnel decisions in connection with her employment with the SCI unit and her LWOP request. But the Motion is denied with respect to Bell's claim of racial discrimination with respect to her employment with the HBPC program.

### B. <u>Retaliation Claim</u>

A prima facie case of retaliation requires a plaintiff to establish that she (1) engaged in statutorily protected activity; (2) suffered an adverse employment action; and (3)

established a causal link between the protected activity and the adverse employment action. Malone v. U.S. Att'y Gen., 858 F. App'x 296, 303 (11th Cir. 2021). "In the context of a retaliation claim, an adverse employment action is one that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). To show a causal connection, the plaintiff needs to show that the protected activity played some part in the way the decision was made. Tonkyro v. Sec'y, Dep't of Veterans Affs., 995 F.3d 828, 835 (11th Cir. 2021) (holding that federal-sector plaintiffs need not "prove that their protected activity was a but-for cause of the adverse actions" and remanding the district court to determine causation under the standard enunciated in Babb).

Here, it is undisputed that Bell engaged in protected activity through her multiple EEOC complaints. For reasons described more fully below, the Court will proceed next to the causation prong.

As the Eleventh Circuit explained just last month:

In federal-sector cases, of course, the employee is not required to show that her protected activity was the but-for cause of the adverse action; it is sufficient to show that her protected activity played a role in the adverse action. Moreover, if

> the employee makes this showing, the employer
> cannot escape liability by presenting evidence that
> it also had nondiscriminatory reasons for its
> action. That is because "even when there are non-
> pretextual reasons for an adverse employment
> decision . . . the presence of those reasons doesn't
> cancel out the presence, and the taint, of
> discriminatory considerations.

Varnedoe v. Postmaster Gen., No. 21-11186, 2022 WL 35614, at

*3 (11th Cir. Jan. 4, 2022) (citing Babb II, 992 F.3d at 1199,

1204-05).

Here, in the absence of any other evidence of retaliatory

animus, Bell relies on temporal proximity between her EEO

activity and the allegedly adverse actions taken against her.

A plaintiff can show a causal connection by showing a close

temporal proximity between her employer's discovery of the

protected activity and the adverse action, but the temporal

proximity must be "very close." Thomas v. Dejoy, No. 5:19-

cv-549-TKW-MJF, 2021 WL 4992892, at *10 (N.D. Fla. July 19,

2021) (looking to temporal proximity test post-Babb and

citing Debe v. State Farm Mut. Auto. Ins., 860 F. App'x 637,

639-40 (11th Cir. 2021) (noting that a one-month delay may

satisfy the test, but a three-to-four-month delay is too

long)).

As Bell points out, in April 2017, she initiated her

first EEOC Complaint. See (Doc. # 52-4 at 5). This EEOC

complaint was based on Soto-Hunter's harassing behavior. (Doc. # 52-3 at 7-8). On June 19, 2017, Bell emailed Lewis, Rippman, and Doloresco complaining of workplace harassment and stating that she had filed an EEOC complaint. (Doc. # 46-2 at 107).

On June 20, 2017, Chief Nurse Rippman changed Bell's working hours from the day shift to a shift stretching from 3:30 p.m. until midnight. (Doc. # 52-4 at 6). Bell claims that she was the only ANM made to work that later shift. (Id.). While other ANMs allegedly had to cover that shift two times per week, Bell never saw them and claims she was the only manager made to work that shift.

Bell filed her second EEOC Complaint on March 22, 2018. (Doc. # 52-4 at 5). In that complaint, Bell raised the issues of: (1) lack of supervisory pay; (2) being made to work the night shift; (3) her reassignment to working under Nurse Manager Carballo; and (4) Lewis and/or Rippman's statements to her on March 5, 2018, that her position was being eliminated. (Doc. # 52-3 at 13-14). Bell filed another EEOC complaint in August 2019, grieving the denial of her LWOP request. (Doc. # 52-3 at 9-11).

As an initial matter, the Tampa VA's refusal to change Bell's position in the SCI to that of a nurse manager or offer

28

her higher pay cannot be causally related to any EEO activity because she was given supervisory duties over the Resource Pool in November 2016 (and requested the commensurate promotion at the same time), but she did not file her first EEOC complaint until the next year. Similarly, while Bell identifies the "realignment" or "elimination" of her position in February or March 2018 as an actionable personnel decision, the record reflects that she filed her second formal EEOC complaint **after** these events occurred. See Debe, 860 F. App'x at 640 ("[I]f the alleged retaliatory conduct occurred before the employee engaged in protected activity, the two events cannot be causally connected."). And these events occurred nearly one year after Lewis, Rippman, and/or Doloresco became aware of the first EEOC complaint. (Doc. # 46-2 at 103); see Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that a three- to four-month delay between the EEO action and the adverse action does not demonstrate causation).

While Bell's move to the HBPC program did occur near the time of her filing of the second EEOC complaint, there is no record evidence that Dr. Leland (who objected to Bell's placement in the program and then later allegedly gave Bell less desirable assignments) had any knowledge of Bell's

earlier EEOC activity. There is similarly no evidence that Rochon was aware of Bell's prior EEO activity.[4] See Malone, 858 F. App'x at 303 (plaintiff's retaliation claim due to be dismissed where he could not point to any evidence that his supervisors were aware of his EEOC complaint at the time he was removed from his post). Bell speculates that Doloresco probably told Dr. Leland about this activity, but such speculation is insufficient to defeat summary judgment. See Id.

Thus, the only potentially adverse action that is close in time to Bell's EEO activity was the placement of Bell on a later shift in June 2017. But even if retaliatory animus did play a part in this shift change, it cannot form the basis of a retaliation claim because it was not, under the circumstances presented here, an adverse employment action.

Whether a particular employment action is materially adverse under the Burlington Northern standard "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position considering all the circumstances." Revere v.

---

[4] To the extent Bell asserts in her declaration that Rochon "participated in an EEO mediation," that mediation did not take place until November 2019, well after all of the alleged adverse actions took place. (Doc. # 52-4 at 19).

Harvey, No. 1:06-cv-2485-CAP-RGV, 2009 WL 10666058, at *17
(N.D. Ga. Feb. 13, 2009), report and recommendation adopted,
2009 WL 10669716 (N.D. Ga. Mar. 20, 2009). Here, the record
reflects that the original ANM position that Bell applied for
was subject to working hours of 3:30 p.m. to midnight. (Doc.
# 46-2, Ex. 2). There is also record evidence that several
other ANMs were assigned to work this shift as well, although
some of them initially resisted this request from management.
(Id. at 315, 372 (35:12-25)). And Bell conceded during EEOC
proceedings that three other ANMs were also required to work
that evening shift starting in or around June 2017. (Id. at
391). Bell does not allege that the shift change was
accompanied by any change in her benefits, pay, or promotion
opportunities.

    Under these circumstances, where the evening shift was
clearly contemplated in the ANM, staffing coordinator nursing
position and where the VA also required several other ANMs to
work this shift around the same time as Bell, the placement
of Bell on an evening shift does not constitute an action
that would dissuade a reasonable worker in Bell's position
from making or sustaining a charge of discrimination. See
Solomon v. Jacksonville Aviation Auth., 759 F. App'x 872, 876
(11th Cir. 2019) (concluding that "isolated schedule changes"

31

did not rise to the level of an adverse action because they would not have dissuaded a reasonable person from filing a discrimination complaint); Benningfield v. City of Houston, 157 F.3d 369, 377 (5th Cir. 1998) (holding that a transfer to the night shift, alone, did not constitute an adverse action); see also Bolden v. City of Birmingham, No. 2:17-CV-1520-TMP, 2019 WL 763513, at *4-5 (N.D. Ala. Feb. 21, 2019) (holding that an employer's denial of a requested shift change was not materially adverse where the employee did not suffer a reduction in pay and did not lose any benefit or promotion opportunity).

For these reasons, the VA's Motion for Summary Judgment is granted as to Count Two.

## C.   Retaliatory Hostile Work Environment Claim

As an initial matter, Bell appears to assert only a retaliatory hostile work environment claim, not a traditional hostile work environment claim. See (Doc. # 52 at 27-30 (limiting her response to address a retaliatory hostile work environment claim)); see also (Doc. # 1 at ¶ 75 (alleging in her hostile work environment claim that the hostile work environment was "due to her EEO activity or . . . was motivated, at least in part, by that activity" and that the VA's actions were "motivated by EEO animus")).

This distinction is important in light of the Eleventh Circuit's recent Babb II holding. There, the Court clarified that, in light of its decision in Monaghan v. Worldpay US, Inc., 955 F.3d 855 (11th Cir. 2020), "retaliatory hostile work environment" claims fall under the rubric of retaliation claims, not true hostile work environment claims. Babb II, 992 F.3d at 1206-07. Thus, such claims are not subject to the "severe or pervasive" standard (like true hostile work environment claims), but should instead be decided under the "well might have dissuaded" standard enunciated in Burlington Northern. Id. at 1207-08.

The VA argues that, even under this standard, Bell cannot show that the events making up her hostile work environment claim were based on, or causally connected to, her EEO activity. (Doc. # 46 at 22). The Court agrees. For the reasons described above, viewing the evidence in the light most favorable to Bell, Bell has failed to demonstrate a link between the totality of events that allegedly created the hostile work environment and her EEO activity. See Terrell v. McDonough, No. 8:20-cv-64-WFJ-AEP, 2021 WL 4502795, at *9 (M.D. Fla. Oct. 1, 2021) (rejecting plaintiff's retaliatory hostile work environment claim where she failed to link the allegedly adverse actions to her EEO activity).

In sum, Bell has failed to establish that a reasonable employee in Bell's position would have been dissuaded by any of these action from filing an EEOC complaint and, indeed, the record reflects that none of them dissuaded Bell from doing so. <u>See Burgos v. Napolitano</u>, 330 F. App'x 187, 190-191 (11th Cir. 2009) (finding no materially adverse action where plaintiff "was not deterred in reinstating her EEOC claim").

Accordingly, the VA's Motion for Summary Judgment will be granted as to Count Three.

## IV.   **Conclusion**

For the reasons given above, summary judgment is due to be granted on Counts Two and Three and on Count One to the extent it is premised on claims of racial discrimination related to the denial of Bell's LWOP request or her employment with the SCI unit. The Motion is denied as to Count One on Bell's claim of racial discrimination with respect to her employment with the VA's HBPC program.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

Defendant's Motion for Summary Judgment (Doc. # 46) is **GRANTED** in part and **DENIED** in part in accordance with this Order.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this

<u>17th</u> day of February, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE